J-A15030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 84 WDA 2022 |

Appeal from the Order Entered December 13, 2021,
in the Court of Common Pleas of Allegheny County,
Orphans' Court at No(s): CP-02-AP-0000014-2021.

BEFORE: BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

MEMORANDUM BY KUNSELMAN, J.:                     **FILED: July 26, 2022**

D.H. (Mother) appeals the order involuntarily terminating her rights to her son K.S. (Child), pursuant to the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a) and (b). After review, we affirm.

The relevant factual and procedural history is as follows: The Child was born in July 2019. The Allegheny County Office of Children, Youth and Families (CYF) first became aware of the family in December 2018, and again in July 2019. CYF accepted a referral due to safety concerns for the Child. CYF became aware that Mother had an active dependency case in New Jersey regarding another child. While in New Jersey, it was determined that Mother lacked adequate skills to parent and should not be reunified with that child. Mother failed to meet her established reunification goals in New Jersey, and that child has since been placed in foster care. Additionally, CYF learned that

before the New Jersey proceedings, Mother had two other children removed from her care and placed with their father in New York. While in New York, Mother was diagnosed with schizophrenia, bi-polar, and depression. She has an IQ level of 66.

On July 24, 2019, CYF obtained an Emergency Custody Authorization (ECA) from the trial court, and CYF, along with members of the local police department, went to Mother's home to execute the ECA. The Child was ultimately located on the property, the Child's father, D.S., (Father) brought him out of the house, and the Child was placed in foster care.[1] At that time, Mother did not permit CYF or the police to enter her home.

On July 26, 2019, the trial court held a shelter hearing. At its conclusion, the court granted return of the Child to Mother conditioned upon Mother having appropriate housing and the implementation of crisis in-home services. On July 31, 2019, CYF attempted to complete a home assessment at Mother's residence. CYF was unable to complete a full assessment with Mother because she refused to sign release of information forms. Due to Mother's lack of cooperation, CYF was unable to obtain basic psychological information about Mother, and could not determine the correct level of services needed by the family. As such, CYF was unable to return the Child to Mother's home as ordered at the shelter hearing.

---

[1] Father's parental rights were also terminated, but he did not file an appeal.

CYF then filed a dependency petition on August 2, 2019. At the subsequent hearing, the trial court postponed the adjudication hearing, ordered the Child to remain in foster care placement pending Mother's mental health evaluation, and permitted her supervised visitation with the Child. CYF filed an amended dependency petition on August 29, 2019. After an expedited adjudicatory hearing, the Child was adjudicated dependent on September 4, 2019. As noted by the trial court:

> At the dependency proceeding, the [trial court] made the following findings: Mother had three other children, one dependent child in New Jersey, and two children in New York in care of their father. Mother failed to meet the established goals of the New Jersey matter. Father is from Georgia and arrived days before [the] Child's birth. [The] Child's pediatrician . . . provided information that he saw [the] Child multiple times following his birth and had concerns regarding [the] Child's weight and Mother's and Father's ability to properly feed him. [The] Child gained 11 ounces following his placement in foster care. [W]hen CYF attempted to execute the ECA, [the] Child was present in the home, but Mother stated he was not, and that he was in the care of a babysitter named "Brittany Spears."

Trial Court Opinion, 2/23/22, at unnumbered 8 (citations omitted). The trial court adjudicated Child dependent because the court "could not return the Child to parents even with the most intensive in-home crisis services because the basic feeding schedule of this newborn would require 24-hour support from various outside agencies." *Id.* at unnumbered 9 (citation and footnote omitted).

On October 11, 2019, Child's temporary foster placement was changed to his current Foster Parents, who have retained custody of him. Child has never returned to Mother's care since his removal in July 2019.[2]

Ultimately, DHS filed a petition to terminate Mother's rights on January 21, 2021. The trial court held the termination hearing on December 10, 2021. CYF presented the testimony of Dr. Gregory A. Lobb, an expert in child psychology, and a CYF casework supervisor, as well as persons who worked for organizations that provided services to Mother. Mother also testified.

After hearing argument from the parties, the trial court granted the petition and terminated Mother's rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).

Mother timely filed this appeal, in which she raises two issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] §2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [Child] pursuant to 23 Pa.C.S.[A.] §2511(b)

---

[2] Mother gave birth to another child in June 2020, and that child was also placed with the Foster Parents. Although the parties also discussed that child's dependency proceeding, the order at issue in this appeal involves only the Child.

Mother's Brief at 6.

Mother's issues involve whether termination was proper under Section 2511(a) and (b). We review these issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result.

*T.S.M.*, 71 A.3d at 267 (citations and quotation marks omitted).

With this standard in mind, we turn to the substantive law governing the termination of parental rights. Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Instantly, the trial court terminated Mother's rights under Section 2511(a)(2), (5), (8) and (b). Here, we consider the trial court's decision to terminate Mother's parental rights pursuant to Section 2511(a)(2), which provides:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes

of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **C.M.K.**, 203 A.3d at 262 (citation omitted). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. **In re Z.P.**, 994 A.2d 1108, 1117 (Pa. Super. 2010).

Here, the record supports the trial court's finding that "CYF [had] demonstrated by clear and convincing evidence that Mother is unable to parent due to her incapacity and neglect; and further, those conditions will not be remedied within a reasonable time due to Mother's lack of effort." Trial Court Opinion, 2/23/22, at unnumbered 11. The trial court considered the all the testimony presented and found that Mother did not complete any of her goals for reunification. The court first summarized the testimony regarding Mother's goal of addressing her cognitive limitations:

> Goals in this case were established to foster reunification between Mother and the Child. Mother was ordered to connect with the Office of Intellectual Disabilities ("OID") due to Mother's prior mental health diagnosis in order to address cognitive obstacles as well as to have parenting support. Mother testified that the reason she never connected with OID for support is because CYF failed to provide a telephone number, contact person or the location for the OID. CYF caseworker supervisor, Nikole Ficorilli, credibly testified that CYF made the referral to OID for Mother as well as [prompted her] many times to utilize the referral. Mother's testimony was also contradicted by Julianne Bendzsuk from Achieva, who testified that Mother was offered assistance with communicating and participating with any service providers that may be beneficial to her and her children. Ms. Bendzsuk testified that Achieva assisted Mother in making telephone calls to connect with OID, but Mother failed to avail herself of this additional opportunity for support and failed to take the additional steps, including the interview and intake process. Mother has been represented by legal counsel throughout the life of this case as well as attended multiple permanency review

hearings where the goal of OID was discussed. The court rejected the testimony of Mother in favor of Ms. Ficorilli and Ms. Bendzsuk. The [court] finds that Mother failed to remedy that goal for reunification.

Trial Court Opinion, 2/23/22, at unnumbered 11-12 (citations and excess capitalization omitted).

The trial court also found that Mother failed to meet her goal of seeking services to aid in her visitations with Child:

Another goal set for Mother was coached parenting visitation, which transitioned into therapeutic visitation. Mother was originally ordered to attend coached parenting visitation, but there was a waiting list that prevented [] Mother from commencing that service. CYF testified that upon further discussion Mother needed a higher level of supervision with the Child than coached parenting; a referral [was] made to Achieva on January 2, 2020, for the more intensive therapeutic visitation. Mother had her first supervised therapeutic visit through Achieva on July 29, 2020. [Ms.] Bendzsuk, who oversees the parenting support program, testified that Achieva was involved with the supervision of Mother's visits until the last in[-]person visit on June 4, 2021. In addition to therapeutic visitation services, Achieva offered Mother "wrap-around" supports to enhance her parenting and life skills. Ms. Bendzsuk testified that Mother was inconsistent with visitation, and "her visitation attendance was dropping off more frequently and consistently: as the case progressed. Mother's inconsistent visitation caused the progress to become stagnant, as large portions of her visits were reacclimating Mother to the routine and structure previously established. Ms. Bendzsuk opined that at the time of her last visit, Mother still require[d] verbal prompting for parenting as well as support. At the time of the hearing, Mother was not at the level of parenting to be afforded the smallest amount of unsupervised time – only fifteen (15) minutes alone without support. The court accepted the testimony of Ms. Bendzsuk that Mother has not progressed with therapeutic visitation for Achieva to recommend return and reunification. Accordingly, the court finds that Mother has failed to remedy the issues necessitating the services of coached/therapeutic visitation.

Trial Court Opinion, 2/23/22, at unnumbered 12-13 (citations and excess capitalization omitted).

Another goal the trial court found Mother did not meet involved her mental health and her failure to make herself available for an evaluation of her interaction with Child:

> Another goal for Mother was to attend and participate in an individual mental health evaluation as well as an interactional evaluation with the Child. CYF wanted to ensure that Mother was receiving the appropriate level of services for the mental health issues identified in New Jersey. The purpose of the interactional evaluation was to assess parental inadequacies as a result of the New Jersey dependency proceedings and the referral of the case at hand for child neglect. Mother received six (6) referrals to attend these examinations. Dr. Gregory Lobb, a stipulated expert in forensic and child psychology, testified that Mother failed to appear in person for all the individual evaluations and he was only able to interview her during a telephone call. Mother testified that she was aware of how important the individual and interactional evaluations were to reunification with her child, but no one ever contacted her regarding the evaluations. Mother further acknowledged the multiple court orders that ordered that Mother shall follow the mental health recommendations from Dr. Lobb after the scheduled evaluations[.] The court finds that Mother did not meet this goal.

> In this case, Mother had the goal of mental health treatment that ran in parallel with the same New Jersey dependency goal. Mother averred that she was engaged with Wesley Family Services ("Wesley") for outpatient mental health services. Mother signed releases of information for CYF to discuss her mental health case with Wesley. Ms. Ficorilli testified that CYF contacted Wesley and learned that Mother is not consistently engaged in mental health treatment. Mother testified that she is in compliance with her mental health treatment, but offered no witnesses or exhibits to support her position during the hearing. Mother thwarted CYF's attempts to ascertain Mother's true mental health needs by failing to attend the court ordered evaluations. This court gave heavy weight to the expert testimony of Dr. Lobb who reviewed Mother's past mental health reports/treatment recommendations, and

- 9 -

opined that Mother needed mental health treatment and therapeutic intervention. The court that Mother failed to meet her mental health goal.

Trial Court Opinion, 2/23/22, at unnumbered 13-15 (citations and excess capitalization omitted).

Finally, the trial court found that Mother failed to achieve her goal of enjoying consistent visitation with the Child:

> Visitation was Mother's final goal. A cornerstone of reunification with a child in placement is to make efforts to engage with child through visitation. Multiple witnesses testified regarding the lack of consistency by Mother. Dr. Lobb opined that a parent working towards reunification with their child should be attempting to increase his/her visitation time, and it caused him concern that Mother had not visited the [Child] since June 4, 2021. Mother's visits with [the] Child occurred in her home requiring no transportation or travel for her. Because of the inconsistency of visits, since April 6, 2021, Mother was required to confirm her visitation in advance. CYF filed a motion to decrease visitation on June 2, 2021, due to Mother's decrease in visit confirmations. [That same day,] this court reduced Mother's supervised visits to one time per month. Mother provided no reasonable explanation for her lack of visitation other than she worked overnight until 7:00 [a.m.], and her visits were from 9:00 [a.m.] until 11:00 [a.m.] One of Mother's obstacles to consistent visitation was that she was "tired" from working overnight and CYF was unable to move the visits one hour earlier to 8:00 [a.m.] The court finds Mother's rationale as placing her own needs above the needs of her infant child. The court takes particular note that Mother's visits were in the comfort of her own home and the Child was transported to her. There was no effort required of Mother to facilitate a visit other than remaining awake following her overnight work schedule and later in the case to confirm the scheduled visit to avoid [the Child] unnecessarily being transported. Mother showed no remorse for the inconsistent visitation per Dr. Lobb and failed to recognize the impediment she created with therapeutic visitation. Again, at the time of the hearing [Mother's] visits continue[d] to be supervised. Accordingly, the court finds that Mother failed to meet the goal of visitation.

- 10 -

Trial Court Opinion, 2/23/22, at unnumbered 15-16 (citations and excess capitalization omitted).

Having found that Mother failed to establish any of her goals, the trial court found that :

> The evidence clearly established the persistent nature of the issues that have caused Mother to be unable to provide essential care for Child. Given the fact that [the] Child has been in the care of the foster family for 28 months, the court justifiably concluded that Mother cannot or will not remedy the problems that have made her incapable of functioning as [the] Child's parent. Therefore, CYF has satisfied grounds to terminate under subsection (a)(2)[.]

Trial Court Opinion, 2/23/22, at unnumbered 16-17 (excess capitalization omitted).

Our review of the record supports the trial court's conclusion. Given the court's discussion above, Mother's bare assertion that "CYF offered no evidence that [she] had not remedied the conditions that led to the removal" of the Child is contradicted by the record and, therefore wholly meritless. Mother's Brief at 16. Moreover, Mother's argument that Dr. Lobb "never observed Mother with [the Child] and could not assess [her] parenting capacity," is disingenuous, given Mother's failure to make herself available to the expert despite six scheduled appointments. *Id.*

In addition, while the record does support Mother's claim that she had "made some progress over time," *id.*, her inconsistency in visitation and her failure to take advantage of the services offered her largely negated any progress. Moreover, while it is true that Ms. Ficorilli, the CYF caseworker who

testified was relatively new to the case, she reviewed the entire case file before her testifying in this matter. *See* N.T., 12/10/21, at 52. Finally, contrary to Mother's claim that she testified credibly, the trial court found otherwise. We cannot disturb that determination. *T.S.M*, *supra*.

In sum, we discern no error or abuse of discretion when the trial court determined that CYF provided sufficient evidence of Mother's inability and/or refusal to provide parental care under Section 2511(a)(2), and that after 28 months, Mother's failures could not or would not be remedied.

Having addressed the first prong of the termination analysis under Section 2511(a), we turn now to Mother's second issue, which concerns the second prong under Section 2511(b).

Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(b).

This Court has explained that:

> [S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child.

- 12 -

> In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary, and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting bond to be too attenuated). We add, the court is not required to use expert testimony to resolve the bond analysis but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d at 1121. Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child is a major aspect of the Section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted). However, a parent's own feeling of love and affection for the child does not preclude the termination of parental rights. *Z.P.*, 994 A.2d at 1121.

Instantly, the trial court determined that termination would best serve the Child's needs and welfare because the evidence presented established that no bond existed between Mother and the Child, and that Child enjoys a strong bond with Foster Parents. As the court explained:

> Mother failed to attend the scheduled interactional evaluations with [the] Child and Dr. Lobb, despite acknowledging the value and importance for the dependency case and reunification. Dr. Lobb was unable to render an expert opinion regarding the bond between Mother and [the] Child because she did not avail herself for the interactional evaluation(s). However, [Ms.] Bendzsuk from Achieva testified regarding her observations between Mother and [the] Child.
>
> [Ms.] Bendzsuk offered a glimpse into the bond between Mother and the Child where she explained that the gaps in visitation would impact the infant child as to not be acclimated with Mother and a portion of the visit was needed just to reestablish engagement. In this case, the Child was removed from [Mother] when he was only 19 days old. At the time of the hearing, the Child has remained out of Mother's care for approximately 870 days or 2 years, 4 months, and 16 days. Given the Child's age of 29 months, it is impossible for the Child to articulate any bond that may exist with Mother. The Child has had no in person contact with Mother since June 2, 2021, and any contact has only been a sporadic monthly virtual contact through "Face-Time" arranged with foster mother.
>
> Mother's testimony at the hearing demonstrated the lack of any significant bond when she stated, "I think he does recognize me" when discussing a virtual interaction. Dr. Lobb's report gave guidance to this court, even though he was discussing Father and not Mother, when he explained that "a bond between a parent and child is not formed during brief virtual visits, it is formed, groomed and maintained through constant contact with parent and child. This court finds that Mother clearly loves [the] Child, but any bond that may exist is only a unilateral bond on her part. There has not been constant contact between Mother and the Child, and he was only in her care for a mere 19 days out of the 889 days of his life. Any bond that initially exist[ed] during those first 19 days of life has not been maintained nor fostered during placement. The

Child has no real relationship with Mother, and Mother does not obtain a "default" bond by failing to avail herself for the interactional evaluation.

Trial Court Opinion, 2/23/22, at unnumbered 18-20 (citations and excess capitalization omitted).

The trial court then discussed and compared the bond the Child has with Foster Parents:

Conversely, Dr. Lobb observed the relationship with the [Foster Parents] and [the] Child. It was clear to him that [the] Child looks to the [Foster Parents] as his parental figures. It was Dr. Lobb's opinion that [the] Child goes to them for the things he needs and that [the] Child appeared to feel safe and comfortable with [the Foster Parents]. [The Foster Parents] demonstrated positive parenting skills with [the] Child, are engaged with him and it was clear that the Child feels comfortable with them. Dr. Lobb described the attachment with the [Foster Parents] as a "secure attachment" which is the healthiest attachment. Dr. Lobb further opined that [the Foster Parents] are the psychological parents for [the] Child, as he has known them his entire life. They meet [the] Child's needs on a daily basis and his biological brother resides with the [Foster Parents].

Dr. Lobb's ultimate opinion was [the] Child needs permanency and it was evident that existed with the [Foster Parents]. Being that Mother has had limited progress for the past two years it was in [the] Child's best interest that he have permanency. Further, [the] Child would not suffer any detrimental effects if termination occurred because [the] Child has had limited contact with Mother. On the other hand, Dr. Lobb believed that were [the] Child removed from the [Foster Parents], it would be very difficult for him to make that change at this point as they are his caretakers.

[The] Child deserves permanency. The court finds that a strong and positive bond does exist with the [Foster Parents], who provide a loving and safe environment that is fertile grounds for a well-adjusted life, which is what the [Foster Parents provide]. In comparison, the court relied on Dr. Lobb's expert opinion that it was apparent Mother had limited insight to what is going on and

- 15 -

what her limitations are, which to him, meant knowing what those limitations are and knowing what supports to have in place to keep the [Child] safe.

Trial Court Opinion, 2/23/22, at unnumbered 20-21 (citations and excess capitalization omitted).

Given the above, the trial court found the Child's need for stability and permanence at his young age established that the developmental, physical, and emotional needs and welfare would be best served by terminating Mother's parental rights pursuant to Section 2511(b).

Our review of the record amply supports this conclusion. On appeal, Mother reiterates her meritless claim that Dr. Lobb's expert opinion should be disregarded because he never saw her interact with the Child. While Mother claims that the record is unclear if she ever received proper notice of the scheduled appointments, the trial court found her testimony to be unworthy of belief.

Mother further cites Ms. Bendzsuk's testimony regarding her one observation of her interaction with the Child and that her own testimony "described in detail the benefits [the Child] would lose if the relationship between [she] and [the Child] were terminated." Mother's Brief at 19 (citing N.T., 12/10/21, at 195). Mother does not enumerate these benefits in her brief. Moreover, although she cites to a page from her hearing testimony, our reading reveals no benefits but only her belief that the Child recognizes her.

Finally, Mother asserts that the Child loves her, "derives the benefit of affection and happiness from [his] relationship" with her, and that the Child

deserves to have the relationship with her preserved. Mother's Brief at 20. The only testimony to support this conclusion was provided by Mother. Once again, we cannot disturb the trial court's finding that her testimony was not credible. *T.S.M.*, *supra*.

In sum, the record supports the trial court's termination of Mother's parental rights pursuant to 23 Pa.C.S.A. sections 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2022